CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

FEB 15 2023

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | |
|---|---|
| WADE W.,[1] | ) |
|     Plaintiff, | ) Civil Action No. 4:21-cv-00045 |
| | ) |
| v. | ) REPORT & RECOMMENDATION |
| | ) |
| KILOLO KIJAKAZI, | ) By:    Joel C. Hoppe |
| Acting Commissioner of Social Security, | )          United States Magistrate Judge |
|     Defendant. | ) |

Plaintiff Wade W. asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' arguments, and the applicable law, I find that the Commissioner's denial of benefits is supported by substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge affirm the decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

1

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[2] Social Security ALJs follow a five-step process to

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Wade applied for SSI and DIB in December 2018. *See* Administrative Record ("R.") 203–11, 212–15, 219–27. He alleged that he became disabled on June 30, 2018, because of cataracts in both eyes and right knee issues. R. 242, 246. Wade was forty-two years-old, or a "younger person" under the regulations on his alleged onset date ("AOD"). R. 58; 20 C.F.R. §§ 404.1563(c),416.963(c). Disability Determination Services ("DDS"), the state agency, denied Wade's claims initially in April 2019, *see* R. 54–66, 67–75, and upon reconsideration in September 2020, R. 80–87, 88–95. In April 2021, Wade appeared by telephone with counsel at an administrative hearing before ALJ Brian B. Rippel. R. 29–53. Wade testified, R. 33–47, as did a vocational expert ("VE"). R. 48–52. ALJ Rippel issued an unfavorable decision on April 26, 2021. R. 15–24.

ALJ Rippel found that Wade had the following "severe" medically determinable impairments ("MDI") during the relevant time between June 2018 and April 2021: asthma and

3

obesity.³ R. 18. He also discussed Wade's other diagnosed MDIs (hyperlipidemia and hypertension, learning disorder, and bilateral cataracts) and found them to be non-severe. R. 18–19. None of Wade's severe impairments or combination of impairments met or medically equaled the severity of any listing, specifically Listing 3.03 (Asthma). R. 19. ALJ Rippel then evaluated Wade's residual functional capacity ("RFC") and found that he could work at all exertional levels with the following nonexertional restrictions:

> only occasional exposure to respiratory irritants, such as fumes, odors, dust, gases, or poorly ventilated areas; work must not involve exposure to workplace hazards, including unprotected heights and dangerous machinery; work must not involve driving vehicles or similar moving equipment (such as forklifts or tractors); there must be no significant reading or writing as part of job duties.

R. 19. This RFC ruled out Wade returning to his past "semi-skilled" work as a plumber's helper. R. 23. Relying on the VE's testimony, however, ALJ Rippel found that this RFC would have allowed Wade to do certain medium unskilled occupations (counter supply worker and laundry worker), *id.*; certain light unskilled occupations (assembler and laundry worker), R. 24; and certain sedentary unskilled occupations (assembler and inspector grader), *id.* All of the occupations had an SVP rating of two. R. 23–24 (citing R. 49–51). Thus, ALJ Rippel concluded that Wade was not disabled between June 30, 2018, and April 26, 2021. R. 24. The Appeals Council declined to review that decision, R. 1–4, and this appeal followed.

### III. Discussion

Wade challenges the Commissioner's denial of benefits on several grounds. *See* Pl.'s Br. 4–13, ECF No. 15. First, Wade argues that the ALJ erred by "disregarding [his] academic records and psychological testing, by failing to develop the record, and by failing to order a

---

³ The ALJ found that Wade's AOD came several years after his date last insured for DIB. *See* R. 18. Accordingly, the ALJ denied Wade's claim for DIB. R. 24. Wade does not challenge that finding on appeal.

4

mental examination." *Id.* at 4. Second, Wade argues that that ALJ Rippel was "unqualified to find that [Wade] is able to perform work at Reasoning Level Two" without medical opinion to support that finding. *Id.* at 8. Wade's arguments are unpersuasive.

Because Wade challenges only ALJ Rippel's assessment of his alleged intellectual disability, the court will limit its discussion of the record to evidence related to that impairment.

    A.    *Summary*

    1.    *Educational Records*

The bulk of the Record in this case consists of Wade's educational records from elementary, middle, and high school. R. 304–422. Wade repeated kindergarten. In his second year of kindergarten in 1981, Wade began speech therapy because his "expressive and receptive language skills [were] below normal for his chronological age" of six years, two months old. *See* R. 417. Later that school year, Wade's teacher referred him for psychological testing because he was not making satisfactory progress for promotion. R. 410. David R. Lovern, Ed. S., certified school psychologist, evaluated Wade and found that he was "immature in his speech, social and emotional growth" and he "exhibited a short attention span and was highly distractible in th[e] one-to-one working situation" during that two-part evaluation. *Id.* Mr. Lovern administered a variety of tests and techniques used for evaluation, and ultimately found that "Wade's mental expression" fell in the "lowermost Borderline range," though "near average ability" was suspected. R. 410–11.

Mr. Lovern recommended that Wade's case be reviewed by the Eligibility Committee. R. 411. Wade was referred for an Individualized Education Program ("IEP") and in first grade was placed in self-contained learning disabilities' program at his local elementary school. R. 414; *see* R. 320.

5

Wade continued to be evaluated by teachers on a yearly basis as part of his IEP. *See, e.g.*, R. 399–400, 401–02, 403–04. Wade showed some improvement from second through fourth grade, but he continued to have difficulty with many math skills, and in particular, language skills. R. 394, 399, 401.

During fifth grade, as part of Wade's "triennial review to aid in determining his continued eligibility for special education services," Wade was referred for psychological evaluation. R. 392–93. School psychologist Barbara L. Paarfus, M.A, evaluated Wade in 1987, and found that he functioned at a "Low Average" intellectual ability who was "achieving several years below his current 5th grade placement in school." R. 393. Wade's arithmetic was at the second percentile and he was "at the tenth percentile or below in all of the learning modalities on the VADS [Visual Aural Digit Span test]." R. 393. She advised against trying to "mainstream Wade into the regular" curriculum given his "weak" performance on that evaluation. *Id.*

From sixth to seventh grade, Wade's special-education teachers found that he continued to struggle with language skills, particularly with written and oral expression. R. 383, 388–89. He also had difficulty with many math skills. *Id.* He showed mild improvement in reading, spelling, and math skills in eighth grade. R. 358.

In June 1990, during eighth grade, the Eligibility Committee evaluated Wade as part of his triennial evaluation. R. 376–82. He was found to have a "low average" intellectual level of functioning and was performing at a "below average" level in reading and oral language and at an "average" level in written language and math. R. 378. On the administered tests, Wade was reading and spelling at a beginning third-grade level, his math problem solving was at a second-grade level, his calculation was at a fifth-grade level, and his written language skills were at a

6

beginning third-grade level. *Id.* Ultimately, the Eligibility Committee found that Wade was eligible to continue in the self-contained learning-disabled program. R. 376.

In high school, Wade continued his IEP, and initially was on track to graduate with a regular or advanced diploma. R. 332. Through tenth and eleventh grade, Wade continued to demonstrate weakness in his language and math skills. *See* R. 327, 340.

At his next triennial review in 1993, during eleventh grade, Wade was evaluated by Lisa J. Hailstone, who found that he continued to function within the Low Average range of abilities. *See* R. 320–22. There was "significant scatter" in the performance portion of Wade's cognitive assessment. R. 321. "Basic academics were below expectancies," and Wade's perceptual weaknesses appear[ed] to continue to have a detrimental affect on his achievement in school." *Id.* The Eligibility Committee found Wade eligible to continue in the Specific Learning Disabilities Special Education Program. R. 323. In his educational evaluation, the evaluator found that Wade's reading, math, written language, and general information levels ranged between the third and fifth grade levels. R. 312. This evaluation was done when he was in eleventh grade. *Id.* Wade dropped out of high school later that year. *See* R. 34.

Apart from his educational records, Wade did not provide any other evaluations relating to his intellectual MDI. Wade's few medical records concerned treatment of his cataracts, R. 423–26, and his hyperlipidemia and hypertension, R. 429–46. These records contained examination findings showing normal disposition and orientation. R. 425. At the time of the DDS medical examiners' review of the record, Wade had not alleged disability based on intellectual functioning, and the DDS examiners did not discuss Wade's intellectual MDI. *See* R. 58–59, 61 (Apr. 2019); R. 80–81, 84 (Sept. 2020).

    2.    *Subjective Statements*

Wade completed an Adult Function Report in March 2019. R. 252–64. In this report, Wade described his daily activities from the time he woke up until going to bed; he got dressed, fed and watered his chickens, fixed breakfast, made his bed, did a "little work around the yard or [an] odd job," and sometimes read a book. R. 257. He took care of his chickens by feeding them and giving them water, but he had help with those tasks. R. 257–58. He did not need reminders to take care of his personal needs, grooming, or take medicine. R. 259. He prepared his own meals once or twice a day, but he "couldn't see to cook" because of his cataracts. *Id.* Regarding house and yard work, Wade stated that he washed clothes, cleaned his house, split wood, and removed leaves, for ten or thirty minutes daily. *Id.* He did not need help or encouragement doing these tasks. *Id.* He went outside daily unless it was raining or snowing. R. 260. He mainly walked or rode in a car as his modes of transportation. *Id.* Wade did not drive because he did not have a driver's license. *Id.* He shopped in stores for groceries, animal feed, and gas, about once a week for two hours. *Id.* He could pay bills, but could not count change, handle a savings account, or use a checkbook/money orders because he "couldn't [] see." *Id.* Wade had various hobbies and interests, such as reading, watching TV, and doing puzzles, but he stopped reading and puzzles after developing cataracts and he "had to use eyeglasses to watch TV." R. 261. Wade spent time with others watching TV, "talk[ing] work," and eating. *Id.* He went to stores and fast-food places on a regular basis. *Id.* He did not need to be reminded to go places, nor did he need someone to accompany him. *Id.*

Wade's cataracts impacted his ability to see, but his impairments did not cause other limitations, such as with remembering, understanding, concentrating, or completing tasks. R. 262. He could finish what he started and pay attention for a "few" minutes. *Id.* He followed written instructions well before he developed eyesight problems, and he followed spoken

8

instructions well. *Id.* Wade indicated that he got along well with authority figures and had never been fired or laid off from a job because of problems getting along with other people. *Id.* He handled stress and changes in routine well. *Id.* Finally, Wade stated that he very recently started wearing artificial lenses in both eyes, and he would need to use them for the rest of his life to read. *Id.*

At the administrative hearing, Wade testified that he was in special education in high school, and could read and write, but had to "use glasses" and "stop" with his writing many times. R. 34. Wade worked as a plumber's helper until 2008 before he was laid off for lack of work. R. 35, 40; *see also* R. 247. In that job, he laid down pipe, cut pipe, put the fitting together, and core drilled. R. 35. He also did a little work with electric and the heating and cooling systems, *id.*, and he organized things in the trailer and gathered materials, R. 39. He thought he could not currently work as a plumber's helper because of his knee problems. R. 46.

Wade then discussed his schooling. R. 36. He had to repeat kindergarten and stopped going to school after completing the eleventh grade. *Id.* Wade could "read a little bit" of the letters his attorney sent to him, but he "couldn't really understand what [they] mean[t]," even when explained to him. R. 37.

Wade no longer had a checking account, but when he did, he could write checks to pay bills. *Id.* He also testified that he managed his own money. *Id.* He stated that he lived with his brother and his mother. R. 38. His mother helped him do a "bunch of different kinds of things . . . like grocery and stuff." *Id.* He shopped for his own clothes, and his mother occasionally reminded him of appointments to make sure he "got it right." *Id.* His mother did not remind him or help him with things like taking care of himself. *Id.* His brother took him to his doctor's

9

appointments. R. 38–39. Wade did not have a driver's license because he did not pass his test. R. 39. On a "normal day," Wade fed his animals, cut the grass, and split and boxed wood. R. 45–46.

Wade discussed his knee pain and problems walking and vision problems. R. 41. Wade had cataract surgery on both eyes two years earlier. R. 43. He wore glasses for reading, and these glasses were not prescription, but ones he picked up at the drugstore. R. 42, 43. Because of cataracts "when [he] [was] in a bad light [he] can't hardly see real good," and when he went to the store, he could "hardly read anything" and required assistance from his nephew. *Id.* Wade could see while working with things, such as coins on a table in front of him. R. 43–44. He could read if the letters and characters were big enough, like the lettering on a "bar of soap," but he could not read "smaller" print, like the letters of ingredients on a can of food, without his glasses. R. 41, 44–45.

B.   *The ALJ's Decision*

ALJ Rippel summarized much of this evidence in his written decision. R. 18–24. First, he found that Wade had not engaged in substantial gainful activity ("SGA") since June 30, 2018, his alleged disability onset date. R. 18. At step two, he found that Wade had severe MDIs of asthma and obesity. *Id*. ALJ Rippel also found Wade's "learning disorder" to be a non-severe MDI because it did not cause "any difficulties since his alleged onset date." R. 18–19. The ALJ explained that Wade's education records showed "a history of special education enrollment due to a learning disability and his most recent intellectual testing of record, from May 1993, indicated overall abilities in the low average range," although that information was "remote with the latest testing . . . occurring nearly 30 years ago." R. 18 (citing R. 320–21). Additionally, Wade was on track to obtain a regular high school diploma before dropping out of school. *Id.* (citing R. 329). Wade testified that he could "read, write, and understand basic math concepts,"

10

and "despite [Wade's] history of academic difficulties, [he] has been able to engage in substantial gainful activity as a plumber's helper, which was described [by] the vocational expert as being semi-skilled." *Id.* (citing R. 236–40). Lastly, the ALJ noted that Wade's treatment records did not indicate any cognitive deficits and his brief psychological exams were normal. R. 18–19. ALJ Rippel found Wade's bilateral cataracts to be non-severe because Wade testified that he could read when using non-prescription reading glasses, he could read labels in a grocery store, and he denied vision problems, according to treatment notes from 2019 to 2021. R. 19 (citing R. 423–26, 427, 437–38, 441, 444); *see also* R. 22 (ALJ noting, "although [Wade] struggle[d] to read fine print, he [could] see without limitation as long as he [was] wearing reading glasses."). Nevertheless, the ALJ accounted for his vision impairment in the RFC. *Id.*

ALJ Rippel concluded that Wade retained the physical RFC to "work at all exertional levels," but limited him to "only occasional exposure to respiratory irritants," no exposure to "workplace hazards," no driving vehicles or similar moving equipment, and no significant reading or writing. R. 19. In making this RFC finding, ALJ Rippel "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." R. 20. At step five, relying on the VE's testimony, the ALJ found that Wade could perform several unskilled occupations. R. 23–24.

C.   *Discussion*

Wade argues that ALJ Rippel improperly assessed his learning disorder by purportedly "disregarding" his academic records and psychological testing, by failing to develop the record, and by failing to order a mental examination. Pl.'s Br. at 4. Wade also argues that ALJ Rippel needed to have a medical opinion to find that he was able to perform work at a Reasoning Level Two. *Id.* at 8. These arguments are unpersuasive.

11

> 1. *Failure to Consider Academic Records & Failure to Develop the Record*

Wade asserts that his academic records show he has intellectual limitations that affect his functional abilities, particularly in concentrating and overall intellectual functioning. When the ALJ assessed Wade's learning disorder at step two, he was required to consider all the evidence in the record, *see* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3), to determine whether Wade's learning disorder "significantly limited" his physical or mental abilities to do "basic work activities" during the relevant time, *see id.* §§ 404.1522(a)–(b), 416.922(a)–(b). An ALJ may consider a medical impairment(s) to be "not severe" when he logically explains why "it is a *slight abnormality* which has such a *minimal effect* on the individual," *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984), that it does not meaningfully disrupt his ability to do basic work activities, SSR 96-3p, 1996 WL 374181, at *2 (July 2, 1996). *See, e.g.*, *Alla Z. v. Berryhill*, No. 5:17cv61, 2018 WL 4704060, at *3–4 (W.D. Va. Sept. 30, 2018) (substantial evidence supported conclusion that claimant's anxiety and depression were nonsevere where ALJ cited limited abnormalities on mental-status exams and lack of mental-health treatment beyond medications prescribed by a general practitioner); *cf. Coffey v. Colvin*, No. 1:09cv830, 2013 WL 6410383, at *4 (M.D.N.C. Dec. 9, 2013) (noting that "[a]lthough courts generally consider an impairment . . . severe so long as it is not obviously slight, insignificant, or meaningless," the claimant "must support any showing with relevant medical evidence"). Basic work-related mental activities include "understanding, carrying out, and remembering simple instruction; use of judgment, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." SSR 85-28, 1985 WL 56856 at *3 (Jan. 1, 1985); *see* 20 C.F.R. §§ 404.1522(b)(3)–(6), 416.922(b)(3)–(6).

The ALJ determined that the evidence was insufficient to show that Wade's learning disorder caused any "significant difficulties" since his AOD on June 30, 2018. R. 19. Explaining this conclusion, the ALJ first noted that Wade's academic records showed that he had a learning disability and had been enrolled in special education. He then observed that Wade's most recent intellectual testing, which was in 1993 when Wade was 17 years old, showed that Wade had overall intellectual abilities in the low-average range.[4] This observation was accurate. Psychological evaluation testing placed Wade's "overall abilities within the Low Average range" in 1990 and 1993. R. 320–21. Wade theorizes, "there is a significant possibility that [his] overall Performance score was borderline." Pl.'s Br. 6. That theory is not supported by the conclusion in the psychological report. Nevertheless, the ALJ could reasonably rely on that report as evidence that Wade's intellectual abilities were in the low-average range.

Wade also faults the ALJ for finding that his academic records are too remote and for not adequately considering those records. The ALJ, however, clearly "considered" the school psychological reports, which contain summaries of Wade's intellectual abilities from when he was a student. R. 18 (citing R. 320–21); *see Wiseman v. Colvin*, 3:14cv28750, 2015 WL 9075457, at *17 (S.D. W. Va. Nov. 24, 2015) (noting that an "ALJ clearly did not ignore" a medical opinion where he both "summarized" its contents and "explained why the opinion was entitled to little weight"); *Presnell v. Colvin*, No. 1:12cv299, 2013 WL 4079214, at *4 (W.D.N.C. Aug. 13, 2013) ("Consideration does not require favorable consideration."). Noting that the academic records were "remote" as they were created "nearly thirty years ago," R. 18, the ALJ then discussed the more recent information in the record, including Wade's testimony, function report, relevant work history, and treatment notes. The regulations require an ALJ to

---

[4] Wade concedes that his academic testing shows he would not meet Listing 12.05. Pl.'s Br. 6.

13

consider such evidence in assessing a person's claim for disability. *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). Nonetheless, Wade does not acknowledge that the ALJ discussed this additional evidence in support of his decision. This evidence of Wade's functional abilities when he was an adult provides ample support for the ALJ's conclusion. Wade worked as a plumber's helper for several years until he was laid off. In that job, Wade cut and laid pipe, and he worked with electric and heating and cooling systems. The VE characterized plumber's helper as a semi-skilled job.[5] Additionally, Wade could perform normal activities of daily living independently, and he could read and write, even though he had some trouble understanding his attorney's letters. This evidence combined with the psychological reports showing Wade's low-average intellectual abilities provide substantial evidence for the ALJ's determination that Wade's learning disorder did not cause him any significant difficulties during the relevant time.

      Although the ALJ assessed Wade's learning disorder at step two and found that it did not cause any significant difficulties, Wade asserts that the ALJ should have included in his RFC finding a limitation on Wade's ability to concentrate related to his learning disorder. A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite all his medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly

---

[5] "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage, or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks." 20 C.F.R. §§ 404.1568(b), 416.968(b).

established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015).

The ALJ has broad discretion to decide whether an alleged symptom or limitation is supported by or consistent with other relevant evidence, including objective evidence of the underlying medical impairment, in a claimant's record. *See Hines*, 453 F.3d at 564 n.3; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm the ALJ's RFC findings when he considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and his decision built an "accurate and logical bridge from that evidence to his conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). *See Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019).

Wade contends that testing from 1982 and 1987 in his academic records "showed [Wade] 'frequently exhibited a short attention span and was highly distractible.'" Pl.'s Br. 5 (quoting R. 410 and citing R. 393). Wade asserts that these records show he has a "moderate" limitation in maintaining concentration, persistence, or pace. *Id.* He faults the ALJ for not including such a limitation in the RFC. Wade does not discuss any of the more recent evidence in the record to support this argument. Indeed, in his functional report, Wade stated that he had no problem completing tasks, and he did not indicate that his impairments affected his ability to concentrate. R. 262. Thus, Wade's argument is contrary to the evidence, which according to his own statements about his functional abilities show that he did not have difficulty concentrating.

15

Wade also argues that ALJ Rippel erred by not developing the record, specifically by not ordering psychological and IQ testing. Pl.'s Br. 5–6. While an ALJ has a duty to "explore all relevant facts and inquire into the issues necessary for adequate development of the record," *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986), the ALJ "is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record," *Bell v. Chater*, No. 95-1089, 1995 WL 347142, at *4 (4th Cir. 1995) (quoting *Clark v. Shalala*, 28 F.3d 828, 830–31 (8th Cir. 1994)). The claimant carries "the burden of establishing a prima facie entitlement to benefits." *Bell*, 1995 WL 347142, at *4; *see also* 20 C.F.R. §§ 404.1512(a), 416.912(a) (describing the claimant's duty to prove that he is blind or disabled).

Regarding the ALJ's duty to order psychological testing, the regulations specify that the ALJ "*may* decide to purchase a consultative examination" in certain circumstances. 20 C.F.R. §§ 404.1519a(a), 416.919a(a) (emphasis added). An additional consultative examination may be warranted "to try and resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision on [a claimant's] claim." 20 C.F.R. §§ 404.1519a(b), 416.919a(b). For example, an ALJ may decide to purchase a consultative examination when (1) the "additional evidence needed is not contained in the records of [the claimant's] medical sources"; (2) "[t]he evidence that may have been available from" the treating physician or "other medical sources cannot be obtained" for reasons beyond the claimant's control, such as "death or noncooperation of a medical source"; (3) "[h]ighly technical or specialized medical evidence that [the ALJ] need[s] is not available from [the claimant's] treating or other medical sources"; or (4) "[t]here is indication of a change in [the claimant's] condition that is likely to affect [the claimant's] ability to work . . . ." *Id.*

16

Wade argues that the additional evidence needed (the psychological and IQ testing) was not contained in the record and that determining his IQ scores requires highly technical and specialized medical evidence. Pl.'s Br. 8. Wade's arguments do not show that the evidence of his intellectual functioning was inconsistent or that the evidence would not support a determination on his disability claim. The ALJ noted that Wade's academic records indicated abilities in the low-average range. R. 18. As discussed above, the ALJ addressed Wade's learning disorder at step two. *Id.* He considered evidence from Wade's academic record, his treatment notes, Wade's testimony and report of functional abilities, and his substantial gainful employment as a plumber's helper, which the ALJ found was semi-skilled. R. 18–19. This information provides an adequate basis for the ALJ's determination. Thus, I find that the ALJ could properly elect, in his discretion, not to order a consultative exam. *See* 20 C.F.R. §§ 404.1519a(a), 416.919a(a).

*2. Reasoning Level*

Wade also argues that ALJ Rippel needed a medical opinion to support his purported finding that Wade was able to perform work at Reasoning Level Two. Pl. Br. 8. *But see* R. 23–24 (ALJ finding that Wade could perform certain "unskilled" occupations "with SVP ratings of two"). Wade argues that "when an RFC finding requires the interpretation of raw medical data and the medical record contains no medical opinion to support the RFC finding, the ALJ commits reversible error by making the RFC finding of his own." Pl.'s Br. 8 (citing *Manso-Pizarro v. Sec'y Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)). Wade correctly asserts that an ALJ may not interpret raw medical data, *see Manso-Pizarro*, 76 F.3d at 17; *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 108 (4th Cir. 2020), but that is not what happened here. The ALJ did not interpret raw medical data to assess any limitations attributable to Wade's intellectual functioning. Rather, he based his step-two assessment of Wade's intellectual

17

functioning on Wade's educational records, his past relevant work, his treatment notes, and his subjective statements. R. 18–19. Having considered that information, the ALJ determined that Wade's learning disorder did not cause "any significant difficulties since his alleged onset date." R. 19. An ALJ is not required to obtain a medical opinion to render an assessment of a claimant's functional abilities. *See Felton-Miller*, 459 F. App'x at 230–31. Instead, an ALJ may rely on other relevant evidence in the record. *Id.* That is what the ALJ did in this case, and he cited adequate support for his finding.

Furthermore, the ALJ cited ample evidence to support his step five findings. The ALJ found that Wade performed substantial gainful employment as a plumber's helper. R. 18. The VE identified that occupation as semi-skilled with an SVP[6] 4. R. 49. Wade does not dispute the VE's classification of his work or the ALJ's adoption of the VE's classification. The Dictionary of Occupational Titles ("DOT") rates plumber's helper as Reasoning Level 3. DOT 869.664-014, 1991 WL 687601; *see Flores v. Colvin*, Civ. No. 14-1008, 2016 WL 10592157, at *13 (D.N.M. Feb. 10, 2016). Responding to the ALJ's question about a hypothetical worker with Wade's RFC and vocational profile, the VE identified jobs that the person could perform at the medium, light, and sedentary exertional levels that were unskilled[7] with SVP 2. At step five, the ALJ credited

---

[6] "SVP" stands for "Specific Vocational Preparation." An SVP level describes the time typically required to "learn the techniques, acquire the information, and develop the facility needed for average" job performance. Dep't of Labor, Office of Admin. Law Judges, *Dictionary of Occupational Titles* app. C ¶ II (4th ed. 1991). "Unskilled work corresponds to an SVP of 1–2." SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000). An occupation's "Reasoning Level," on the other hand, describes the abilities needed to exercise judgment or understanding, respond to changes or variables, and to follow instructions while performing such work. *See Taylor v. Kijakazi*, No. 1:21cv648, 2022 WL 4668273, at *4–6 (M.D.N.C. Aug. 2, 2022).

[7] "'Unskilled' is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 Fed. App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)). Unskilled work requires the ability "to understand, carry out, and remember *simple* instructions; to respond *appropriately* to supervision, coworkers, and *usual* work situations; and to deal with changes in a *routine* work setting." Soc. Sec. Ruling 85-15, 1985 WL 56857, at *4 (emphasis added); *see also* 20 C.F.R. §§ 404.1568(a), 416.968(a)

the VE's testimony, finding that Wade could perform several unskilled jobs with SVP 2. Although Wade challenges the ALJ's decision, contending that the ALJ erred by implicitly determining that Wade could perform work at Reasoning Level Two, Wade does not mention the ALJ's reliance on his past work as a plumber's helper. That work was at a higher level (semi-skilled, SVP 4, and Reasoning Level 3) than any of the jobs the VE identified (unskilled, SVP 2, and Reasoning Level 2) or the ALJ found Wade could perform. *See* R. 23–24, 52. Wade has not identified any evidence to show that his intellectual ability declined between the time he worked as a plumber's helper and when he applied for disability, and no such evidence appears in the Record. Thus, the ALJ could reasonably rely on Wade's intellectual ability to perform the job of plumber's helper to find that he could perform lower skilled work at a lower SVP or Reasoning Level. Accordingly, I find that substantial evidence supports the ALJ's decision.

IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** Wade's Motion for Summary Judgment, ECF No. 14; **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 16; **AFFIRM** the Commissioner's final decisions denying Wade's DIB and SSI claims; and **DISMISS** this case from the Court's active docket.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or

---

("Unskilled work is work [that] needs little or no judgment to do simple duties that can be learned on the job in a short period of time.").

19

recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: February 15, 2023

Joel C. Hoppe
United States Magistrate Judge